So Ordered.

Dated: October 30, 2023



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Thomas J McGill,                                  Case No. 22-21547-gmh

                     Debtor.                                Chapter 7

Rebecca Jean Behm and
Carmen Behm,

                     Plaintiffs,

v.                                           Adv. Proc. No. 22-02073-gmh

Thomas J McGill,

                     Defendant.

**OPINION AND ORDER**

    Rebecca and Carmen Behm hired Thomas McGill to build a house designed by Carmen, who is an architect. After McGill didn't complete the project, the Behms sued him in a Wisconsin state court for breach of contract. The state court entered a judgment

awarding the Behms $228,595 based on their "undisputed offer of proof", since McGill didn't show up to contest that relief. ECF No. 1, at 4.

About a year later, McGill elected to pursue a discharge of his debts under chapter 7 of the Bankruptcy Code. The Behms commenced this adversary proceeding alleging that the debt McGill owes them is not dischargeable under §523(a)(2)(A) or (B) of the Bankruptcy Code, provisions excepting from discharge debts for money, property, services, or credit obtained by various species of fraud.[1] 11 U.S.C. §523(a)(2)(A) & (B). McGill filed an answer contesting the requested relief. The court held a trial at which both the Behms and McGill appeared.

---

1. The compliant cites only 11 U.S.C. §523(a)(2)(A) or (B) as grounds for requesting a judgment declaring the debt to be not dischargeable, but the facts alleged do not plead with particularity a debt arising out of fraud, as required by Federal Rule of Civil Procedure 9(b), applicable here by operation of Federal Rule of Bankruptcy Procedure 7009. The complaint directly alleges only that the state court judgment

> was, in part, based on plaintiffs' claims expressed in the *Summons and Petition* filed May 12, 2020[,] and *Affidavit in Support of Motion for Partial Summary Judgment* dated November 1, 2020, copies of which are hereto attached, which included, *inter alia*, 1) that the defendant failed to provide lien waivers contrary to representations he had or would obtain them, and 2) refused to continue work on the project unless plaintiffs accepted his demands for payment of equipment costs not specified in the parties' contract.

ECF No. 1, at 2. The state-court complaint alleges only breach of contract, see *id.* at 7–10, and the referenced affidavit, of Carmen Behm, attests to the accuracy of the complaint's allegations, with a bit more added detail: McGill failed to complete the project by May 2019 and, contrary to McGill's statements in a January 2020 email that "he was sending lien waiver forms to all of the subcontractors and would be sending the executed lien waivers to [Carmen Behm]", "[he] never received any such waivers, and . . . to [his] knowledge, no subcontractors were paid by [McGill] except Wolf River Concrete." *Id.* at 17. That's it.

While McGill forfeited the right to contest the potential pleading deficiency by not contesting it, as noted in section II, the Behms throughout this proceeding have never clearly articulated the legal basis for the relief they seek. Aside from §523(a)(2), their complaint refers only to §727 of the Bankruptcy Code, which provides grounds for denying the debtor a discharge. But while the complaint's request for relief "prays . . . for an order denying . . . a discharge", it states that it does so "pursuant to 11 U.S.C. Sec. 523(a)(2)(A) and (B)"—provisions limited to excepting certain fraud debts from discharge, not denying discharge. None of the complaint's allegations, moreover, support a claim under §727 for denial of discharge, nor, as discussed below, did any of the testimony or other evidence offered at trial support such a claim.

This opinion states the court's findings of fact and conclusions of law.[2] See Fed. R. Civ. P. 52; Fed. R. Bankr. P. 7052.

I

The Behms and McGill signed a construction contract in October 2018 under which McGill promised to build a house on an "undeveloped", "rural", "wooded site" using Carmen Behm's architectural plans. ECF No. 43, at 93:15–94:5; Ex. 1, ECF No. 22. Their contract called for the Behms to pay McGill a total of $194,345 to be disbursed in three installments based on project benchmarks. Ex. 1, at 3.

Before signing the contract, the Behms told McGill that they wanted the house constructed by the spring of 2019. ECF No. 43, at 9:3–11:7. Rebecca Behm testified that McGill suggested a completion time of four months but the Behms elected to allow five months instead. *Id.* at 50:18-22. The parties ultimately agreed that "[McGill] w[ould] have the house (substantially) complete", meaning that the Behms would be allowed to "move in . . . by [the] Building Inspector", within "five months after issuance of [the] Building Permit." Ex. 1, at 2.

McGill obtained the building permit on or about October 25, 2018. ECF No. 43, at 11:21–23. The Behms then paid McGill an initial installment of $75,000 in November 2018. *Id.* at 15:4–9; Ex. 2, ECF No. 23. They paid him a second installment of $42,700 in April 2019, more than five months after the building permit issued. ECF No. 43, at 95:2–8; Ex. 3, ECF No. 24.[3] McGill conceded in his testimony that "the house was

---

2. "[D]eterminations as to the dischargeability of particular debts" and "objections to discharges" are core proceedings under 28 U.S.C. §157(b)(2)(I) & (J). This court has jurisdiction and the authority to enter a final judgment pursuant to 28 U.S.C. §§157(b) & 1334(b) and the district court's standing order referring all bankruptcy proceedings to this court. Order of Reference, E.D. Wis. (July 10, 1984), https://www.wied.uscourts.gov/general-orders/order-reference.
3. In addition to these installment payments, the Behms paid a plumbing subcontractor $12,751, a bill that Rebecca Behm testified McGill should have paid out of the first two draws. ECF No. 43, at 61:1-62:6; see Ex. 8, ECF No. 29. The Behms also paid a small additional amount to McGill to install two windows in the garage, but the Behms do not take issue with that payment. ECF No. 43, at 80:3–10,

nowhere near complete" when he received the second installment payment in April 2019. ECF No. 43, at 16:17-20.

McGill explained that he encountered two main construction problems: (1) the lot's sandy soil and and (2) a disconnect between the size of the windows provided for in the architectural drawings and the windows purchased by the Behms. While McGill visited the unimproved site with the Behms before signing the construction contract, he testified that he could not tell the condition of the soil because it was a wooded lot and he claims to have learned about the soil's condition only after the excavation was complete, though Carmen Behm testified that he told McGill about the soil condition, which Behm asserted was common in most of Waushara County where the lot is located. ECF No. 43, at 40:1–19; 93:15–94:2 & 112:8–18. In all events, McGill testified that the site's sandy soil made it difficult to get equipment to the site and use equipment at the construction site, causing delays and a need to keep rented equipment on site for "longer periods of time." *Id.* at 16:21–17:9; 40:1–23 & 112:8–114:8.

As for McGill's second problem—that several of the windows the Behms ordered did not match the architectural drawings—each party claimed at trial that the other was responsible.[4] McGill credibly testified, however, that he did not discover that the

---

82:24–83:17. Finally, Rebecca Behm testified that, in July 2019, when the Behms "were ordering . . . . cabinets", they made out a check to McGill for a downpayment "to the cabinet makers" that he then "s[at] on" for "about seven weeks" before the downpayment "finally got paid." *Id.* at 56:4–57:14.

       4.       Rebecca Behm testified that the Behms ordered the windows in December 2018 and McGill "was responsible for signing off [on] that order and getting a copy of it, and double checking those window sizes." ECF No. 43, at 66:11–21; Ex. 10, ECF No. 31. In her view, McGill was responsible for reviewing the windows the Behms purchased against the Behms' architectural plans and for deviating from the drawings if necessary to ensure that the constructed framework accommodated the size of the purchased windows. ECF No. 43, at 66:16–21; 78:1–79:21. McGill testified that before April 2019 he did not have "any paperwork or other documentation to tell [him] what size windows were actually coming" and he relied on the plans that the Behms provided when framing the house. *Id.* at 108:13–17. McGill further testified that he could not move forward with the project until the windows were installed. *Id.* at 109:12–22. The testimony diverged about when the parties knew about the window problem. Carmen Behm testified that he believes that McGill told him about the window issue in spring or early summer 2019. *Id.* at 104:23–105:2 & 106:12–21. McGill testified that the windows were delivered to the project site

windows the Behms purchased didn't match the openings provided in the architectural drawings until after he had constructed the window openings according to the specifications in the drawings. *Id.* at 36:11–37:12. McGill further credibly testified that to accommodate the different sized windows, he would need to build a temporary wall to support the structure, tear down the old wall, and then rebuild the wall with resized window openings. *Id.* at 28:3–18 & 37:15–38:10.

Regardless of who is to blame for these setbacks, the parties' relationship soured, and on December 8, 2019, the Behms sent McGill a letter requesting, among other things, "[a] lien waiver from each entity providing labor and/or material for this project" and "[e]ngineering design documentation of elements for this project requiring engineering by the building code". Ex. 4, ECF No. 25. Carmen Behm followed up with McGill on December 30, again requesting that he send lien waivers. Ex. 5, ECF No. 26. McGill testified that, by then, the project was only forty percent complete and he had not provided the Behms with any lien waivers or engineering design documentation. ECF No. 43, at 21:3–19 & 25:14–27:3; see also Ex. 6, ECF No. 27. McGill sent Rebecca Behm an email on January 3, 2020, stating that he was "sending lien waivers to all [the subcontractors] to fill out and send to [her] with stamped, addressed envelopes", and that he would send her, "via email, the engineering paperwork . . . within a few days", but, as he conceded in his testimony, he never did. Ex. 7, ECF No. 28; ECF No. 43, at 29:1–30:2. Based on McGill's testimony, including his acknowledgment that he never sent lien waivers to any subcontractors or made any effort to deliver the paperwork, the court infers that he never intended to live up to the January 3 email's promises. Sometime after he sent his January 3 email, McGill stopped working on the project.

---

in April or May 2019. *Id.* at 107:17–24. Regardless, McGill credibly testified that he did not know about the window problem before April 2019.

As mentioned earlier, the Behms sued McGill in Waushara County Circuit Court for breach of contract and obtained a $228,595 judgment against him.[5] Rebecca Behm testified that the judgment included damages for the money they "had to pay subcontractors and other people that Mr. McGill should have paid", as well as $64,000 for damages related to work that was not performed to code and "had to be fixed by other people." ECF No. 43, at 63:10–25.

II

Most judgments for breach of contract are dischargeable, and the Behms have never articulated a clear rationale for the judgment they seek in this adversary proceeding. Based on their pleading and arguments, including mainly the argument they present in their closing brief, as well as the evidence they presented at trial, the court ultimately concludes that the Behms are seeking a determination that McGill owes them a debt that is not dischargeable under 11 U.S.C. §523(a)(2)(A) or (B).

A

Before turning to whether the Behms have proved that McGill owes them a debt that is excepted from discharge by §523(a)(2), this opinion, for the sake of completeness, first addresses the Behms' statements, in the complaint and elsewhere, that "[t]he statutory predicates for the relief sought herein are 11 U.S.C. Secs. 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5)." ECF No. 1, at 1. These provisions all concern grounds for *denying* a chapter 7 discharge, rather than *excepting* particular debts *from* such a discharge.[6] The

---

5. The state-court complaint is attached as an exhibit to the complaint in this proceeding, as is the judgment the Behms obtained. ECF No. 1, at 4 & 7–10.
6. The cited provisions of §727 state:

> (a) The court shall grant the debtor a discharge, unless—
>
> . . .
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed,

complaint's wherefore clause fails to keep distinct the difference between denial of discharge and declaring particular debts not subject to the discharge, requesting "an order denying the defendant[]-debtor[] a discharge pursuant to 11 U.S.C. Sec. 523(a)(2)(A) and (B)(i) inasmuch as the defendant-debtor seeks to discharge a debt for money obtained from the plaintiffs by a false representation or actual fraud, and/or his use of a written statement that is materially false." *Id.* at 2. McGill never challenged the complaint, and the matter proceeded to trial with no clarifying motion practice.

The Behms' pretrial report does not address the nature of the relief they seek, nor does it cite any provisions of the Bankruptcy Code. Instead it describes the proceeding as "a case of fraud", with citations to Wisconsin appellate decisions applying state law, and casts the Behms' case as principally "alleg[ing] that the defendant fraudulently obtained money from them by promising to construct their house within a timeframe he was unable to meet[] and promising to provide lien waivers he never obtained." *Id.* at 1–2. That allegation harmonizes far better with a request that the debt McGill owes them is not subject to discharge than it does with a request to deny McGill a discharge.

---

      destroyed, mutilated, or concealed—
         (A) property of the debtor, within one year before the date of the filing of the petition; . . .
         . . .
      (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
      (4) the debtor knowingly and fraudulently, in or in connection with the case—
         (A) made a false oath or account; [or]
         . . .
      (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

After trial, the Behms filed a "brief in lieu of closing arguments". ECF No. 45, at 1. That brief cites **no** legal authority: no statute, no caselaw, no treatise, nothing. The brief argues:

> The testimony and evidence in this case clearly and convincingly establish the following facts: 1) that the defendant (hereinafter, "McGill") obtained moneys from the plaintiffs (hereinafter, "Behm[s]") by misrepresenting the amount of time needed to complete the building project; 2) that McGill induced the Behms to continue the project with him by misrepresenting that he had, or would obtain, lien waivers from his subcontractors; and 3) that McGill acted in bad faith by demanding Behms pay for certain equipment costs as a condition for completing the project.

*Id.* at 1–2. The brief then asserts, "These facts constitute fraudulent acts on the part of McGill for which *denial of discharge* is an appropriate remedy." *Id.* at 2 (emphasis added). Rather than explain this assertion—with reference to applicable legal authorities—the brief's "argument" section, quoted here in its entirety, suggests only that McGill's debt to the Behms arises from misrepresentations and that McGill should, therefore, be denied a discharge:

> Bankruptcy exists as a social benefit for the honest but unfortunate debtor. As shown above, McGill is not such person. By misrepresenting the amount of time he would need to actually complete the home; by misrepresenting how the Behms' funds were being used; by applying at least some amount of those funds for his own personal bills and expenses; and by misrepresenting that lien releases for the subcontractors would be forthcoming, McGill defrauded the Behms into paying nearly three-quarters of the purchase price for a home, which as attested to by their judgment against him, ultimately cost them an additional $228,595.00 to finish. For these reasons, *the court should not afford McGill the benefit of discharge*.

*Id.* at 4 (emphasis added).

The purported misrepresentations described in the Behms' post-trial brief might be grounds for determining that McGill owes the Behms a debt excepted from discharge

by §523(a)(2), but, if the Behms are seeking a judgment denying McGill a discharge, they have not met their burden under any of the provisions of §727(a) cited in their complaint (or anywhere else in the record): §727(a)(2)(A), (a)(3), (a)(4)(A) & (a)(5). None of the evidence presented at trial establishes the elements of a claim under any of these provisions. No evidence showed, or even suggested, that McGill acted "with intent to hinder, delay or defraud" creditors or anyone else by transferring or disposing of his own property "within one year before the date of the filing of the petition"; that he "concealed, destroyed, mutilated, falsified, or failed to keep or preserve . . . recorded information" about his "financial condition or business transactions"; that he "knowingly and fraudulently . . . made a false oath or account" in connection with his bankruptcy case; or that he "failed to explain satisfactorily . . . any loss [or deficiency] of assets". §727(a)(2)(A), (a)(3), (a)(4)(A) & (a)(5). What is more, the Behms' failure to develop any argument for denying McGill a discharge under §727(a) constitutes a waiver of that request, if, indeed, the Behms are even intending to make such an argument. E.g., *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (citing *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009)) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.").

B

As for whether McGill owes the Behms a debt that is excepted from a chapter 7 discharge by the fraud and deceit provisions of §523(a)(2)(A) & (B), the Behms bear the burden of proving each element of any such claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). To prevail under §523(a)(2), the Behms must prove that McGill owes them a debt "for money, property, services, or . . . credit . . . obtained by" either (A) "false pretenses, a false representation, or actual fraud, other than a statement respecting [McGill's] financial condition" or (B) the use of a "materially false" written statement about McGill's "financial condition" that the Behms "reasonably relied" on and that McGill "made . . . with intent to deceive".

McGill's debt to the Behms arises from the $228,595 judgment in their favor entered against McGill by the Waushara County Circuit Court. ECF No. 1, at 4. As mentioned above, that judgment does not identify the nature of the claim, and the Behms' state-court complaint, which the Behms attached to their complaint in this proceeding, alleges only breach of contract, not fraud or misrepresentation. ECF No. 1, at 7–10. McGill does not contend that the state court's entry of a judgment on the Behms' breach-of-contract claim precludes the Behms from proving in this proceeding that the underlying debt is one for "money, property, services, or . . . credit . . . obtained by" fraud of a kind specified in §523(a)(2); he insists only that the Behms failed to meet their burden of proof at the trial in this proceeding.[7]

The Behms' post-trial brief is of no practical assistance in understanding why McGill's debt should be adjudged not dischargeable—indeed, it makes no mention of §523(a)(2), at all, and fails to describe or address any of the elements of a claim under §523(a)(2)(A) or (B). The Behms have therefore forfeited any right to that relief. But, again for the sake of completeness, the remainder of this opinion explains why none of the misrepresentations claimed in the Behms' post-trial brief warrant a determination that McGill's debt to them is excepted from a discharge under §523(a)(2)(A) or (B).

1

Turning first to §523(a)(2)(A): Under the circumstances presented, to obtain a judgment that McGill owes the Behms a debt excepted from discharge by §523(a)(2)(A), they must prove that he owes them a debt "for money, property, services, or . . . credit . . . obtained by . . . false pretenses, a false representation, or actual fraud". §523(a)(2)(A). The essence of any claim under §523(a)(2)(A) is that the debtor, "whether by word or

---

7. The Supreme Court has held that neither reducing a claim to judgment nor settling it prevents a creditor from seeking a later adjudication that the debt is excepted from discharge by §523(a). *Archer v. Warner*, 538 U.S. 314, 320–21 (2003); *Brown v. Felsen*, 442 U.S. 127, 138 (1979). Notably, though, both the settled claim (in *Archer*) and the adjudicated claim (in *Brown*) were alleged to have sounded in fraud, unlike the Behms' breach-of-contract claim. See *Archer*, 538 U.S. at 317; *Brown*, 442 U.S. at 128.

deed, . . . somehow cheat[ed]" the creditor, which "requires some type of 'moral turpitude' or 'intent to deceive' on the part of the debtor", rather than simply not abiding by his promises. *In re Montgomery*, No. 13-12883, 2015 WL 5584504, at *1 (Bankr. N.D. Ind. June 10, 2015) (first citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); then citing *In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995); then citing *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir. 1984); then citing *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir. 1986), overruled in part on other grounds by *Grogan*, 498 U.S. 279; and then citing *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986), overruled in part on other grounds by *Grogan*, 498 U.S. 279); see also *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (construing "actual fraud" under §523(a)(2)(A) to mean "anything that counts as 'fraud' and is done with wrongful intent", such as a fraudulent conveyance).

The Behms' post-trial brief can be read to contend that, in considering whether McGill owes them a debt excepted from discharge by §523(a)(2)(A), the court should find that McGill (1) "misrepresent[ed] the amount of time needed to complete the building project"; (2) "induced the Behms to continue the project with him by misrepresenting that he had, or would, obtain lien waivers from his subcontractors"; (3) "acted in bad faith by demanding [the] Behms pay for certain equipment costs as a condition for completing the project"; (4) "misrepresent[ed] how the Behms' funds were being used"; and (5) "appl[ied] at least some amount of those funds for his own personal bills and expenses". ECF No. 45 at 1–2 & 4. But, for the following reasons, the Behms failed to prove that McGill obtained money from them—that is, incurred a debt to them—by any such intentional acts of deceit or fraud.

*Representation of time to complete the project*. There is no question that the project continued long past the five-month period provided in the parties' agreement. But the evidence does not demonstrate that McGill lied about either how much time the project would take or his ability or intent to complete the project on time. McGill credibly testified that the project was delayed by problems that developed after it commenced,

including soil conditions that impeded excavation and construction and the Behms' purchase of windows larger than those specified in Carmen Behms' architectural drawings. McGill testified specifically that the window issue, which was never resolved, impeded completion of several parts of the project. ECF No. 43, at 18:6–23; 28:3–14; 37:6–39:11 & 109:12–22. While the Behms contend that McGill should have adjusted for the soil conditions and the window issue on his own, there is simply no credible evidence that he intentionally promised a completion deadline that he had no sincere hope of meeting. *Id.* at 18:6–23. McGill's failure to complete the job on time was, at most, breach of contract, not fraud.[8]

---

8. "[T]he concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). As *Palmacci* explains,

> The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id.* at 787 (first citing *Anastas v. Am. Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996); then citing *Milwaukee Auction Galleries Ltd. v. Chalk*, 13 F.3d 1107, 1109 (7th Cir. 1994); then citing *Mellon Bank Corp. v. First Union Real Est.*, 951 F.2d 1399, 1410–11 (3d Cir. 1991); and then citing *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1219, 1221 (8th Cir. 1985)). And, as the Seventh Circuit further explained in the context of a diversity suit for fraud and breach of contract, fraud in the inducement cannot be inferred from nonperformance alone:

> The making of a promise normally implies at the very least that the promisor does not have a fixed intention not to honor it; so, if he does have that intention, he is guilty of misrepresentation. But courts naturally are concerned lest every breach of contract be levered into fraud by the too-facile expedient of asking the jury to infer from the fact that the defendant did not perform his promise that he never intended to perform it. So the rule has grown up that nonperformance is not enough to ground such an inference; there must be additional evidence of the defendant's intentions at the time he made the promise.

*Milwaukee Auction Galleries*, 13 F.3d at 1109 (citations omitted) (first citing *Hartwig v. Bitter*, 139 N.W.2d 644, 647 (Wis. 1966); then citing *U.S. Oil Co. v. Midwest Auto Care Servs., Inc.*, 440 N.W.2d 825, 827 (Wis. 1989); then citing *FDIC v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir. 1980); then citing *Fowler v. Happy Goodman Fam.*, 575 S.W.2d 496, 499 & n.3 (Tenn. 1978); then citing *Mfrs. & Traders Tr. Co. v. Cottrell*, 71 A.D.2d 538, 543 (N.Y. App. Div. 1979); and then citing Restatement (Second) of Torts §530 cmt. d).

*Promises to provide lien waivers.* The Behms' assertion that McGill committed fraud when he promised to provide lien waivers similarly fails for lack of compelling evidence. McGill promised lien waivers at two different times. The first was when the parties entered into the construction contract.[9] Like the promised completion deadline, there is no evidence that when McGill signed the contract, he did not actually intend to provide the lien waivers. McGill testified that he typically waits until the end of the project to obtain lien waivers, and, though McGill reneged on that promise after the parties' working relationship soured, the evidence does not demonstrate that McGill never intended to honor it. ECF No. 43, at 13:21–14:5 & 29:9–14. In the absence of any such evidence, the Behms cannot show that McGill's initial promise to provide the lien waivers amounts to misrepresentation, deceit, or fraud actionable under §523(a)(2)(A).

McGill separately represented to Rebecca Behm, in January 2020, that he would provide lien waivers. The Behms argue that McGill made this representation, falsely, to induce them to continue the project more than a year after its commencement and that he had no intention of providing the lien waivers until the Behms, at the least, "sign[ed] off on the extras." See *id.* at 26:22–25. But presuming that this representation was actually fraudulent—e.g., McGill made it despite his intention to withhold the lien waivers unless the Behms paid him more—the evidence fails to show that McGill *succeeded,* by this representation, in obtaining any money, property, services, or credit from the Behms: there is no evidence the Behms made any payments of consequence to McGill after the second installment in April 2019 or that they suffered any other discernable losses as a result of any statement McGill made after that installment was paid, including his January 2020 lien-waiver representation.[10] As a result, none of

---

9. The contract provides, "Lien waivers supplied in timely fashion . . . ." Ex. 1, at 3.
10. As noted above, in addition to the two installment payments, in November 2018 and April 2019, the Behms paid $12,751 to a plumbing subcontractor, a small additional amount to McGill to install two windows in the garage, and the amount of a downpayment to McGill for cabinets that he then

McGill's debt to the Behms, as far as the evidence shows, is for money, property, services, or credit *obtained by* McGill's January 2020 lien-waiver representation. Intentionally false or not, that representation cannot serve a basis for concluding that McGill owes the Behms a debt excepted from discharge by §523(a)(2)(A).

*Solicitation of contribution to equipment costs.* Next, the Behms contend that McGill somehow defrauded them for purposes of §523(a)(2)(A) when, in the summer of 2019, he asked them to pay for certain equipment costs to complete the job. See ECF No. 45, at 3–4; ECF No. 43 at 64:25–66:3. The Behms say McGill's request was made in "bad faith"—a characterization that, even if supported by the evidence, hardly rises to intentional deceit. In all events, the evidence does not persuasively suggest that McGill asked for reimbursement of the equipment as a means of deceiving or defrauding the Behms. There is also no proof that, as a result of this request, the Behms actually *made* any payments to McGill; so, like his January 2020 lien-waiver representation, McGill's solicitation of equipment payments in mid-2019 cannot serve as a basis to except from discharge any debt owed to the Behms.

*Use of funds, lack of accounting, and representations about the use of funds.* The Behms also argue that McGill "refused to account for any of the moneys [they] had paid him", "misrepresent[ed] how [their] funds were being used", and used "at least some amount of those funds [to pay] his own personal bills and expenses." ECF No. 45 at 4. McGill conceded that the Behms intended for their installment payments to be used only for the construction of their home, so this opinion presumes that McGill represented (at least implicitly) that he would use the Behms' funds only for completing their project, a representation that could implicate §523(a)(2), if it was a lie. ECF No. 43, at 15:4–16:1.[11]

---

paid out to the cabinet makers. ECF No. 43, at 56:4–57:14, 61:1-62:6, 80:3–10 & 82:24–83:17; Ex. 8. The evidence does not show, however, that the Behms made any of these payments *because of* McGill's January 2020 representation about providing lien waivers.

    11.    To the extent the Behms maintained that McGill used their payments for purposes

McGill testified that he deposited the funds received from the Behms into his general account, which he used to pay both business and personal expenses. *Id.* at 43:24–46:15 & 123:12–17. But McGill further testified that funds in that account *before* he deposited the Behms' installment payments were sufficient to enable him to cover any payments that he made from that account that were not related to the Behms' project, such that he could devote the Behms' installment payments to their project. *Id.* at 45:1–18 & 46:6–12.

The Behms' main effort to show that McGill misused their funds is largely based on the fact that McGill, as he conceded, did not pay a $12,751 bill from subcontractor Johnson Plumbing. *Id.* at 33:14–35:8 & 61:21–25 (discussing Ex. 8). But McGill testified that none of the Behms' funds remained when he received Johnson Plumbing's invoice: he had already spent all of their two installments on other aspects of the project. *Id.* at 41:9–11 & 43:24–46:9. The Behms did not present any contrary evidence: they presented no bank records, no use-of-funds accounting, and no credible testimony that contradicted McGill's. Instead, they assert that his failure to "maintain a separate bank account for the Behms' project", his use of the bank account into which he deposited their installment payments "to pay his personal bills", and his "unexplained lack of funds needed to rent equipment" show that he misused their funds. ECF No. 45, at 4. To the contrary, McGill's testimony that he had funds (totaling $12,000–$18,000) in his bank account before he deposited the Behms' installment payments, that the Behms' was the only project McGill was working on at the time, and that *all* of the funds in that account had been used by the time he received Johnson Plumbing's invoice suggests, as

---

unrelated to the project, they might have been better served to have argued that he owed them a debt for "theft by contractor", see Wis. Stat. §779.02(5), potentially made not dischargeable by §523(a)(4). But demonstrating that McGill owed them a debt not dischargeable under that section would require proof that McGill used their funds for other ends in knowing or reckless disregard of his fiduciary duties and that, as a result, he owes them a debt calculated based on that conduct. See *Ruck v. McGill (In re McGill)*, 653 B.R. 904, 912–14 (Bankr. E.D. Wis. 2023) (applying *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013)). And, by failing to assert a claim for non-dischargeability under §523(a)(4), based on state-law theft by contractor or anything else, the Behms forfeited their right to do so.

much as anything, that McGill may have inadvertently spent some of his own money on the Behms' project, in addition to theirs.

The Behms otherwise point to a "July[] 2020 incident" with "Rebecca's Behm's deposit for the Amish cabinet maker" as "[s]imilar evidence of the deliberate misapplication of [the] Behms' moneys by McGill and dishonesty on his part". ECF No. 45, at 4. Rebecca Behm testified that, in July *2019*, she sent a check to McGill so that he could pay "the downpayment" to "the cabinet makers"; when she asked the cabinet makers about the downpayment a few weeks later, they said McGill "never sent the check"; when she asked McGill about this, he said that he had just received the check and would go to the bank that day; that the Behms' bank statement said that the check had been cashed two weeks earlier; and that McGill "finally" paid the cabinet makers "about seven weeks" after the Behms sent the check to McGill. ECF No. 43, at 56:4–57:14. But even if McGill lied to Rebecca Behm about his receipt and cashing of this check—that is, McGill did not simply misspeak—nothing in the trial evidence suggests that he obtained money, property, services, or credit from the Behms as a result of this statement, thereby incurring a non-dischargeable debt under §523(a)(2)(A). Indeed, as Rebecca Behm conceded in her testimony, McGill did pay the downpayment over to the cabinet makers eventually, which leaves the Behms' proposed inference that McGill "missappl[ied]" those funds inadequately supported by credible evidence. ECF No. 45, at 4.

In sum, the Behms failed to prove that McGill owes them a debt that is not dischargeable under §523(a)(2)(A) because it is for money, property, services, or credit obtained by fraud or deceit.

2

That leaves §523(a)(2)(B), the only other exception to discharge cited by the Behms. To prove that McGill owes them a debt made not dischargeable by that provision, the Behms must prove that they reasonably relied on a materially false

*written* statement about McGill's financial condition that he made with the intent to deceive them. The Behms proved none of this. They submitted no evidence that McGill made any written statement about his financial condition, let alone evidence that he presented such a statement to them that was intentionally false and that they reasonably relied on it. Considering the trial evidence, §523(a)(2)(B) has no applicability whatsoever, and the Behms' failure to explain in their post-trial brief (or anywhere else) how they would have the court apply the law to proposed findings of fact makes it impossible to know whether they truly seek a judgment under that provision or have abandoned their reliance on it. Regardless, any claim based on §523(a)(2)(B) fails on the merits for complete lack of proof, as well as being waived based on the Behms' failure to present any coherent argument for its application.

### III

Based on the reasons stated above, the court orders as follows:

1. Plaintiffs Rebecca Behm and Carmen Behm recover nothing, and this action is dismissed on the merits.

2. The clerk of court is instructed to enter judgment accordingly.

#####